THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Matthew Adkisson, an individual, | No. 2:23-cv-495 |
| Plaintiff, | COMPLAINT<br>WITH JURY DEMAND |
| v. | |
| Epik Holdings, Inc., a Washington Corporation; Epik Inc., a Washington Corporation; Masterbucks LLC, a Wyoming company; Robert W. Monster, an individual; and Brian Royce, an individual, | |
| Defendants. | |

In and for his Complaint, plaintiff Matthew Adkisson alleges as follows:

1.    This lawsuit is about a widespread and illegal fraudulent scheme—replete with misrepresentations, embezzlement, and misappropriation—being perpetrated by Defendants Epik Holdings, Inc. ("Epik Holdings"), Epik Inc., and Masterbucks LLC ("Masterbucks") (collectively, "Epik"), as well as Epik's founder Rob Monster ("Monster"), and Epik's current chief executive officer (CEO) Brian Royce ("Royce") (all collectively referred to as "Defendants").  Epik and its executive officers misappropriated funds from numerous consumers, hiding their illicit activity by securing payments from new victims to pay down old

COMPLAINT (NO. _____) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

debts, and transferring money between the various Epik companies to further obfuscate their fraud.

2.      Matthew Adkisson ("Adkisson" or "Plaintiff") is one of the many individuals that were subject to Defendants' illegal fraud.  In May 2022, Adkisson contacted Epik for what should have been a simple, straightforward domain name purchase.  During the transaction, Defendants made several misrepresentations, embezzled or misappropriated Adkisson's funds, and strung Adkisson along for months with false and empty promises of repayment.  Defendants have admitted liability but refuse to make Adkisson whole.  Adkisson brings this Complaint to recover what he is owed, and to ensure that this ongoing fraud against consumers is finally put to an end.

**PARTIES**

3.      Adkisson is an individual residing in New York, New York.

4.      Defendants Epik Holdings and Epik Inc. are both Washington corporations with the same principal place of business in Sammamish, Washington.  On information and belief, Epik Holdings and Epik Inc. together offer domain name registrar, hosting, sales and related services.

5.      Defendant Masterbucks is a Wyoming company, with a principal place of business in Spokane, Washington.  On information and belief, Masterbucks' sole governing member is Epik Holdings, of which Monster is the majority owner.  Masterbucks claims to offer services relating to domain name transactions.

6.      Monster is an individual residing in King County, Washington, and is the founder and majority owner of Epik.  On information and belief, Monster served as the Chief Executive Officer of Epik since its formation through September 2022, is currently the Chair of the Board for Epik, and his principal residence is the same location as the principal place of business for Epik Holdings and Epik Inc.

COMPLAINT (NO. _____) – 2

7.     On information and belief, Royce is an individual residing in Houston, Texas.  In September 2022, Royce replaced Monster as the CEO of Epik.

## JURISDICTION AND VENUE

8.     This Court has federal question jurisdiction of this action under 28 U.S.C. § 1331 because the action alleges violations of 15 U.S.C. § 1962.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

9.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332, there being complete diversity of citizenship between the parties and the matter in controversy exceeding the sum or value of $75,000, exclusive of interest and costs.

10.     Personal jurisdiction over defendants Epik Holdings, Epik Inc. and Monster is proper because Monster is a resident of, and Epik Holdings and Epik Inc.'s principal place of business are in, Washington.

11.     As more fully set out below, personal jurisdiction is also proper over all Defendants because each regularly conducts business in Washington and this action arises out of or is related to the Defendants' conduct in the state.  On information and belief, Masterbucks, whose sole member is a Washington corporation, regularly conducts business in Washington state and with Washington residents.  Royce, as the CEO of the various Washington-based Epik entities, also regularly conducts business in Washington state and targeted at Washington consumers.

12.     Venue is proper in this District as to Epik Holdings, Epik Inc., and Monster under 28 U.S.C. § 1391(b)(1) because both defendants reside in this District.  Likewise, venue is proper in this District as to Masterbucks because its sole member, Epik Holdings, resides in this District.

13.     Venue is also proper as to all Defendants in this District under 28 U.S.C. § 1391(b)(2) because, as set forth in more detail below, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  Specifically, the fraudulent enterprise and scheme alleged in this Complaint revolves around two Washington corporations

COMPLAINT (NO. _____) – 3

based in this District and a fully owned subsidiary, their CEO, and the majority owner who is also a resident of this District.

## FACTS AND BACKGROUND

### Epik's Widespread Fraud

14.     Epik operates what it calls the "Epikverse" which involves a mix of services offered by various companies owned by Monster, including Epik Holdings, Epik Inc. and Masterbucks.

15.     The so-called "Epikverse" purports to offer a suite of services related to domain names, including registrar services (i.e., the registration of domain names), website hosting, escrow services relating to the purchase and sale of domain names, and privacy protection services (hiding registrant information).

16.     One of the primary services offered by Epik is the sale of domain names. Consumers can list domain names they own for sale through Epik.  Then, if a party wants to buy the domain name, they are instructed to contact Epik to purchase that domain name.  Epik claims to safely handle all components of this sale.

17.     When brokering the sale and purchase of a domain name, Epik claims to act as an escrow agent.

18.     When payment is held in escrow, it must be kept separate and strictly segregated from other funds and cannot be commingled.  Escrow payments do not belong to the agent holding the payment, and they are only allowed to be paid out to a specified entity, for a specified purpose, or returned to the payor.

19.     The way the process is supposed to work is simple.  In acting as an escrow agent for domain purchases, the purchaser sends payment to Epik to be held in escrow and the seller transfers the domain to be held in escrow by Epik.  Then, when Epik has both the domain name and payment in escrow, it should release the domain name to the purchaser and the payment to the seller.  That's how it is *supposed* to work.  But through various disclosures, admissions, and

COMPLAINT (NO. _____) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

actions, it is now clear that Epik has been illegally misappropriating escrow funds to fund its own operations and its officers.

20.     In recent months, consumers started noticing the proceeds from their domain sales weren't being paid out.

21.     Apparently, that was because Epik had mounting debts from escrow payments or domain sales that it had misappropriated, and it was hoping it could hide those losses by using a potential new investment to repay the stolen escrow funds.  To be clear, there should have been no need to replace the escrow funds *because escrow funds should not have been touched by Epik*, except to transfer the funds to the seller or reimburse the payor.  That's how escrow accounts work.

22.     Epik's last hope at hiding their fraudulent scheme vanished when, according to Epik's recent court filing, the potential investment fell through, and the investor sought to divest their investment from Epik.

23.     When the monetary issues began popping up, consumers also began withdrawing their money from Epik.  But Epik no longer had their money.

24.     Consumers came out in droves to complain about their missing money. Consumer reviews of their recent experiences with Epik are replete with stories with the same theme:  they used Epik's escrow services, and Epik stole their money.  Some examples of such reviews--*collected from just the last few months*--are shown below.



**nir fartuk**
1 review    IL

★☆☆☆☆                                                    4 days ago

**Don't even think using Epik service!**

Save your money and time. DO NOT use any of Epik service!!!!

I sold my domain 5 month ago using Epik domain escrow. My domain was sent to the buyer but until this moment I didn't receive my money ($20K!!!). I had a call with new CEO Brian where he admit that thing are messed with the previous owner Rob. Some say he ran away with a few million dollars.

They not return to my emails and have this India guys to take care of support without giving any real answers. This Company is a complete joke

Date of experience: January 01, 2023

COMPLAINT (NO. _____) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000



**Sujan**
2 reviews  ◎ BD

★☆☆☆☆                                                        Jan 20, 2023

### Pending $9300 withdrawal requested from 13th Oct 2022

03(three) month go i requested a withdrawal of my funds and Masterbucks still has not paid any amount.
I sold-out my site for medical treatment and re-invest another website. I was job less from corona 1st time.

They have my ID , bank details, and confirmed this is OK for a payout.

It's really disappointing with your process, so many date problems with masterbucks under maintenance now approval problems. here attached my pending report

**Date of experience:** October 14, 2022



**Akalonu Emmanuel**
1 review  ◎ NG

★☆☆☆☆                                                        Jan 10, 2023

### Sincerely this company are full of liars

Sincerely this company are full of liars. I have been owned some money by epik since last month December and little did I know that a lot of other customers are facing the same issue since August. When ever you contact support the tell you that "they are working with first come first serve" if it's truly how you are paying, how come there are so many persons complaining that you owe them, here and even in other platforms. This is really appalling and it's a shame. I really regret why I sold my domain with epik when there are other companies that does it better. Please stop lying and do the needful.

**Date of experience:** December 12, 2022



**John**
3 reviews  ◎ US

★☆☆☆☆                                                        2 days ago

### 30 days after we sold a Domain Name via…

30 days after we sold a Domain Name via Epik.com they still have not sent us our money. Still giving us the run around game. The escrow money was not for Epik.com to hold and use. We will take legal actions to protect ourselves and others against this abuse of the escrow business model. They have not paid us and continue to screw others in the same way. Seems to be a Ponzi scheme our kicking the can down the road BS. We may seek a Class Action as well. Contact us if you are a victim of Epik.com as well. If your are an employee of Epik and are a part of this scam, you are part of a crime and will be held accountable.

**Date of experience:** March 03, 2023

👍 Useful    ⌁ Share                                              🏳

COMPLAINT (NO. _____) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

25. There are dozens of similar complaints over just the last few months. And at least one customer, DomainEmpire.com, claims that they have an unpaid balance of **$1,500,000**, which has apparently also gone missing.

26. As these debts and consumer complaints quickly piled up, Epik started using payments from new consumers—which, again, were meant to be held in escrow—to pay down old debts.

27. In other words, Epik and its executives including Monster and Royce tried to hide this illegal conduct with yet more illegal conduct.

28. On information and belief, Epik has been using this method of comingling funds and using a newly received escrow funds to replace escrow funds that were previously misappropriated for years.

29. In addition, in an attempt to buy themselves more time in paying their numerous debts, Epik began transferring money and payments between the various Epik companies.

30. For instance, according to one consumer, she used Epik's purported "escrow" services through Epik's website, www.Epik.com, to sell a domain name for $100,000. Again, the process should have been simple: the domain name would be put in escrow, and so would the payment. Then, when both were secured in escrow, the domain and payment would be released to the entitled parties. Instead, according to this consumer, her domain name was sold, but she never received her payment (a total of $91,000 after Epik's fees). And, after requesting her payments, Epik informed her it was transferred to Masterbucks (which is owned and operated by Epik Holdings). But apparently, Masterbucks did not have the funds either, and the funds were reportedly stuck in "processing" unable to be released.

31. This hiding of money between the various Epik entities is but another example of Epik's continued obfuscation to hide their fraud.

32. Epik's fraud is widespread and has likely been ongoing for years.

COMPLAINT (NO. _____) – 7

33.     As one news article notes, "Epik was using money from both [Masterbucks and Epik's in-house escrow service] to fund its operations rather than keeping the funds in separate bank accounts."  The article further claims that, despite claiming to offer escrow services, "[t]he company … didn't have an escrow license."  *See* https://domainnamewire.com/2022/12/01/epik-continues-to-dig-out-from-financial-mess/.

34.     Indeed, Royce confirmed this misuse of escrow funds.  In an October 2022 podcast, Royce was asked whether escrow funds were commingled.  Royce confirmed this illegal activity, admitting publicly that "when [Royce] came on board, everything was, as of September 2--there was kind of a lot of comingling and the separation of operations wasn't there."

35.     Monster has been at the heart of this fraud.  He has been the controlling party throughout the time Epik effectuated their fraudulent scheme.  Monster owned all of the relevant business entities, and personally interacted with many of the consumers that Epik scammed.

36.     As the fraud perpetrated by Monster and Epik began to come to light, Epik placed Royce at the helm as CEO.  But Royce, too, was complicit.  On information and belief, after becoming CEO, Royce continued the practice of moving money around from new customers' escrow funds to pay down old debt from other consumers' missing escrow funds and accounts.

37.     Indeed, after Royce took over as CEO, Epik sent customers an email acknowledging that "[w]hen new management took over Masterbucks, the balance was approximately 4.5 million dollars" but, moving funds around, they claimed to have paid off all but $800,000 of that debt.

38.     That claim turned out to be false too.  Soon after, Royce admitted that they continued to discover additional debts, now amounting to at least $1.1 million.

### Adkisson's Purchase of the Domain Name

39.     Before this massive web of fraud came to light, Adkisson contacted Epik to complete a simple domain name purchase.

COMPLAINT (NO. _____ ) – 8

40.     On May 11, 2022, Adkisson e-mailed Monster seeking to purchase the domain name <nourish.com> which was listed for sale through Epik.

41.     Monster responded that Epik was authorized to sell the domain name for "$300K net to seller, which means $327K gross at our 9% commission." Monster further claimed that he could complete the sale that day.

42.     Monster informed Adkisson that to complete the sale, Adkisson would need to use Epik's escrow services.

43.     Adkisson agreed to pay the requested $327,000 and asked Monster to set up the escrow account.

44.     In response, Monster assured Adkisson that Epik's "escrow service is #1 in the industry" and that they further protect the buyer and seller of domain names because Epik is also "an accredited registrar" and so "take[s] actual delivery of the domain" during sales. Adkisson relied on Monster's representation as to the protections offered by Epik's purported escrow services. But for these representations, Adkisson would not have proceeded with the transaction with Epik.

45.     Monster also claimed that the domain name seller wanted to be paid in crypto currency. Monster instructed Adkisson that after Adkisson funded the escrow account, Epik would handle converting the payment to crypto currency to pay the seller.

46.     At the time, Epik Inc. and Epik Holdings provided an in-house escrow service named "Epik Escrow." Monster directed Adkisson to use the Epik Escrow service in connection with Adkisson's domain name purchase.

47.     That day, May 11, 2022, Adkisson followed the directions provided by Monster and transferred $327,000 to Epik using the Epik Escrow service, to be held in escrow as Monster represented it would be (the "Escrow Funds").

48.     On its website, Epik explained how its escrow services worked: "Epik will receive and hold funds from the Buyer, then receive and hold domain(s) from the Seller. Upon

COMPLAINT (NO. _____ ) – 9

consent of both parties, Epik will deliver domain(s) to the Buyer and distribute the funds to the Seller's account." Further, Epik represented that both the seller and buyer "have the right to cancel the transaction without penalties until the escrow is concluded. If the Buyer has already submitted payment, Epik will reimburse."

49.    However, on information and belief, Defendants were not licensed to act as an escrow agent or to perform escrow services as required under Washington law (RCW 18.44.021).

50.    Despite Monster's claim that the transaction could be completed the same day payment was transferred, Adkisson did not receive the domain name that day. Indeed, Adkisson never received the domain name.

51.    On June 1, 2022, Monster informed Adkisson that were some issues with the seller of the domain name, but that Epik was "working to get this done asap."

52.    Defendants continued to string Adkisson along for months, repeatedly promising that they would deliver the domain name.

53.    On November 14, 2022, and because the domain name had still not been transferred to Adkisson, Adkisson requested the return of his Escrow Funds. Royce promised to continue to try to secure the domain name but further promised "if [that] does not work then we of course will return the funds." On information and belief, when Royce made this promise to "return the funds," he knew it to be false, that Epik had already spent Adkisson's Escrow Funds, and that Epik did not intend to return the Escrow Funds to Adkisson.

54.    Nearly three weeks later, Defendants had still not secured the domain name nor returned Adkisson's Escrow Funds. On December 2, 2022, Adkisson explicitly stated that he would be ending the domain name purchase transaction and again requested that the Escrow Funds be returned.

55.    Adkisson soon discovered that the Escrow Funds he had transferred to be held by Epik in escrow had not, as they were required to be, kept in a separate account pending the sale

COMPLAINT (NO. _____) – 10

of the domain name.  Instead, Defendants apparently used the Escrow Funds as their personal piggybank and misappropriated the entirety of Adkisson's $327,000 escrow payment.

**Misappropriation of Adkisson's Escrow Funds**

56.     In September 2022, Royce replaced Monster as the CEO of Epik. On information and belief, Royce was made aware of the Adkisson's pending escrow transaction and Epik's outstanding debt to Adkisson by no later than September 4, 2022.

57.     On October 18, 2022, Royce informed Adkisson that they "need[ed] to talk," but Royce claimed to be unavailable at that time.

58.     For the next six weeks, Adkisson continued to follow up with Defendants attempting to get either the domain transferred to him or his Escrow Funds returned.  During that time, he did not receive a substantive response.

59.     On December 2, 2022, Adkisson explicitly stated that he would be ending the domain name purchase transaction and again requested that the Escrow Funds be returned.

60.     Finally, on December 6, 2022, Royce responded to Adkisson's repeated messages about his Escrow Funds stating that "we are getting things sorted out and your funds will be returned [in] short order[.]"  Still, no payment was forthcoming.

61.     On information and belief, despite Monster's and Epik's representations that Adkisson's funds would be held in escrow, the Escrow Funds were instead comingled with Defendants' business and/or personal funds, and were used by Defendants for matters unrelated to Adkisson or the sale of the <nourish.com> domain name, including covering Epik's misappropriation of other consumers' escrow funds.

62.     On December 28, 2022, counsel for Adkisson sent Defendants a letter regarding the misappropriated funds.  In the letter, Adkisson informed Defendants that, based on conversations with Royce, "it appears that Epik has stolen the money, or embezzled the funds" and that the parties involved in this conduct "may be guilty of a criminal offense."

COMPLAINT (NO. _____ ) – 11

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

63.     On December 31, 2022, counsel for Epik responded to the letter.  Epik's counsel noted that they did not represent Monster, and that they advised Monster to retain his own counsel claiming that "Monster has no authority to act as an officer, employee, or agent of the company; he is merely a non-executive director and the majority stockholder."  Epik's counsel also requested "a deadline for payment so we can marshal resources" to resolve the matter.

64.     In a subsequent phone call, Epik, through its counsel, admitted that it owed Adkisson the $327,000 it had promised to hold in escrow, and that sometime after Adkisson wired the funds to Epik, it was misappropriated, embezzled or both.  In any case, Epik conceded that the Escrow Funds were no longer available.  Epik further claimed that the company was "cash strapped" and that Adkisson's Escrow Funds were used to pay other debts.

65.     In response, Adkisson requested repayment of his funds by January 6, 2023.  Epik did not refund Adkisson.  Instead, Epik claimed that it had begun discussions with Monster's counsel regarding "how to structurally remove Mr. Monster from having any voting power while still bearing the economic risk of his past acts and omissions" and "the possible source(s) of cash an[d] timing to fund the payment due your client."  They further claimed that "Epik and Mr. Royce are working on this in good faith with the intention of making your client whole."

66.     On January 11, 2023, Epik, through counsel, sent Adkisson a letter promising to repay Adkisson his escrow funds.  Specifically, the letter stated:  "On behalf of Epik Holdings, Inc., Epik shall pay the debt owed to Mr. Adkisson in two installments, one on January 12, 2023, in the amount of $20,000, and the other no later than January 31, 2023, in the amount of $307,000."  Adkisson accepted the proposal.

67.     On January 12, 2023, Monster paid Adkisson $20,000.  However, no further payments were made.

68.     On January 30, 2023—the day before Epik had promised to repay the remaining balance of the Escrow Fund to Adkisson—Epik informed Adkisson that Monster's counsel would be in touch regarding "[Monster's] plan for satisfying the claim."  This was directly

COMPLAINT (NO. _____) – 12

contradictory to Epik's January 11 letter which "[o]n behalf of Epik Holdings, Inc." promised that Epik would repay the full debt by January 31, 2023.  Adkisson reminded Epik of its binding agreement that *Epik* would repay the funds, and do so within the next day.  Epik did not respond and did not complete its promised repayment.  On information and belief, Epik knew, at the time it made this representation, that it did not intend to repay Adkisson.  Instead, it was just another example of the fraudulent misrepresentations being made to consumers like Adkisson and a ploy to delay Adkisson's recovery of his funds.

69.     On January 31, 2023, Monster contacted Adkisson.  He confirmed that the amount owed to Adkisson—$327,000—was not in dispute.  Further, Monster stated that since Royce became CEO of Epik, Monster "believe[d] the company has had ample opportunity to fund a refund to Mr. Adkisson."  Monster identified several sources of funds available to Epik to repay Adkisson including a $1,000,000 loan, a $1,000,000 divestiture received by Epik in October 2022, and other assets "amount[ing to] more than $600,000 in cash."  Based on these claims, it appears that Epik's representations that it was "cash strapped" and so unable to repay Adkisson eres false, and Epik knew they were false when they made those representations.

70.     Monster further represented that "in the event that the Company does not, or will not settle the balance due of $307,000, I am committed to covering this personally, and doing so asap."

71.     No further payments have been made to Adkisson.

## FIRST CAUSE OF ACTION
### *Breach of Contract* (Epik and Monster)

72.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

73.     In connection with the sale of the <nourish.com> domain name, Epik and Monster entered into a valid, enforceable and binding contract with Adkisson.

COMPLAINT (NO. _____) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

74.     Based on Epik's and Monster's representations, Adkisson wired $327,000 to Epik to be held in escrow.  In exchange, Epik and Monster promised to transfer the <nourish.com> domain name to Adkisson, and, in the event the domain could not be transferred, Epik was to return the funds to Adkisson.

75.     Epik and Monster represented that Adkisson's funds would be held in escrow.  As such, Epik was required to keep those funds separate from Defendants' business and personal accounts.  Those funds could not be used for any matter other than the transfer of the <nourish.com> domain name, or were required to be returned to Adkisson.

76.     75.76.  Epik, Royce, and Monster also each separately agreed that Adkisson was entitled to his Escrow Funds and each promised to return Adkisson's funds.

77.     Epik, Royce and Monster breached these agreements. Epik did not transfer the <nourish.com> domain name to Adkisson.  Nor did Epik return Adkisson's Escrow Funds.  Epik also failed to keep Adkisson's funds in escrow, and instead either misappropriated and/or embezzled those funds.

78.     As a direct and proximate result of Epik's and Monster's breaches, Adkisson has been harmed and is entitled to an amount to be proven at trial, and in an amount no less than $307,000 plus interest.

**SECOND CAUSE OF ACTION--**
***Fraudulent Misrepresentation* (All Defendants)**

79.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

80.     In connection with the purchase of the <nourish.com> domain name, Epik requested payment in the amount of $327,000 from Adkisson.  Monster and Epik represented that Epik would serve as an escrow agent and maintain those funds in an escrow account, to be used only if the domain name was transferred to Adkisson, or to be returned to Adkisson.

81.     Monster and Epik intended Adkisson to rely on those representations.

COMPLAINT (NO. _____) – 14

82.     Based on those representations, Adkisson paid $327,000 to the purported Epik escrow account.  Adkisson was harmed by such reliance:  he did not receive the <nourish.com> domain name and did not receive repayment of escrow funds.

83.     Those representations were false, and, at the time they were made, Monster and Epik knew those representations were false.

84.     Adkisson's funds were never placed in and were not maintained in, an escrow account.  Instead, Adkisson's funds were used by Monster and/or Epik to settle separate debts or for other personal reasons, unrelated to Adkisson's purchase of the <nourish.com> domain name.

85.     Additionally, despite representing that they offered escrow services, Epik was not licensed to perform escrow services or act as an escrow agent as required by law.

86.     Adkisson relied on Monster's and Epik's representations regarding their ability to offer escrow services and was damaged by such reliance.

87.     After Adkisson's funds were misappropriated, Royce, Monster and Epik each represented that they would repay Adkisson the amounts owed.  These representations were also false, and Defendants knew they were false when they made them.

88.     Indeed, according to Monster, Royce and Epik had the funds available to repay Adkisson since at least September 2022, and knew of the debt to Adkisson, but chose not to do so.  Defendants never intended to repay Adkisson and instead continued to string him along for months promising repayment.

89.     Adkisson relied on the representations that he would be repaid, and suffered losses in doing so, including but not limited to lost interest and by paying legal counsel to continue to work with Defendants in securing the repayment.

90.     Adkisson's reliance on Defendants' false representations has damaged Adkisson in an amount to be proven at trial.

COMPLAINT (NO. _____) – 15

### THIRD CAUSE OF ACTION
#### *Breach of Fiduciary Duty* (All Defendants)

91.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

92.     An escrow agent owes a fiduciary duty to the parties to the escrow to conduct the transaction with scrupulous honesty, skill and diligence, and must comply strictly with the provisions of the escrow agreement.

93.     By promising to provide escrow services, to act as an escrow agent for Adkisson, and to hold Adkisson's funds in escrow, Epik had a fiduciary duty to Adkisson to exercise a high degree of care to conserve the money placed in escrow and pay it only to those parties entitled to receive the funds.  Specifically, Epik had a duty to properly perform its escrow services including by (a) maintaining Adkisson's escrow funds separately from all other funds; (b) using Adkisson's escrow funds only for the accepted purpose of purchasing the <nourish.com> domain name or returning such funds to Adkisson; and (c) not misappropriating, embezzling or otherwise using Adkisson's Escrow Funds for any other purpose.

94.     At Epik's direction, Adkisson followed all of Epik's instructions regarding use of their Epik Escrow service and placed $327,000 in the Epik Escrow account.

95.     On information and belief, Adkisson's funds were never placed in and were not maintained in, an escrow account.  Instead, Adkisson's funds were used by Monster and/or Epik to settle separate debts or for other personal reasons, unrelated to Adkisson's purchase of the <nourish.com> domain name.

96.     By Epik's conduct, Adkisson has been damaged in an amount to be fully determined at trial.

COMPLAINT (NO. _____) – 16

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**FOURTH CAUSE OF ACTION**
*Violation of the Washington Consumer Protections Act, RCW 19.86.020*
**(All Defendants)**

97.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

98.     The foregoing acts of Defendants constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of RCW 19.86.020.

99.     Defendants' conduct affects and is contrary to the public interest, tends to mislead a substantial portion of the public, and has injured Adkisson.  Defendants' conduct is also likely to be repeated and to injure other members of the public and Washington residents.

100.     Specifically, and in addition to the conduct described above, Defendants claimed to offer escrow services in connection with its services in brokering domain name transfers and sales.  However, instead of providing those escrow services, Defendants misappropriated the funds they promised to hold in escrow.

101.     Defendants also acted unfairly and deceptively in purporting to offer escrow services when, on information and belief, Epik was not licensed to offer such services or to act as an escrow agent.

102.     Additionally, after the sale of the domain name fell through, Defendants represented that they would return Adkisson's Escrow Funds to Adkisson, and had the funds and ability to do so.  Instead, Defendants misled Adkisson to string him along while they used his funds to settle other debts or for other improper purposes.

103.     Defendants are likely to repeat their actions, and likely have and will continue to harm other members of the public in a similar fashion.

104.     As a result of Defendants' conduct, Adkisson is entitled to actual damages, treble damages, costs of litigation and attorneys' fees.

COMPLAINT (NO. _____) – 17

### FIFTH CAUSE OF ACTION
### *Violations of Racketeer Influenced and Corrupt Organizations Act,* 18 U.S.C. § 1962(c)
### (All Defendants)

105.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

106.    Defendants Monster and Royce are "persons" within the definition of 18 U.S.C.§ 1961(3).  Monster is the founder of Epik Holdings, Epik Inc., and Masterbucks.  Royce has served as the CEO for Epik since September 2, 2022.

107.    Epik is an "enterprise" as defined by 18 U.S.C. § 1961(4) and engaged in, and had activities affecting, interstate and foreign commerce.

108.    Royce and Monster wrongfully conducted or participated, directly or indirectly, in the conduct of the affairs of Epik through a pattern of racketeering activity.  In connection therewith, Defendants committed at least the following racketeering acts within the meaning of 18 U.S.C. § 1961(1):

   a.  Fraud by wire, radio or television.  Defendants devised a scheme or artifice to defraud by means of wire communication in interstate or foreign commerce in violation of 18 U.S.C. § 1343, in that, as described above and under false and/or fraudulent pretenses, representations, or promises, purported to act as an escrow service in the sale and purchase of domain names, while in fact, Defendants comingled funds entitled for escrow, misappropriated those funds, and used consumers' escrow funds to obfuscate Defendants' fraudulent activities. Defendants used wire transmissions to transmit false or fraudulent representations regarding its escrow services to obtain money that was also transferred by means of wire transmission.

109.    On information and belief, Defendants racketeering acts have been on-going for years, and began at least as early as May 11, 2022 and continuing through the present.

COMPLAINT (NO. _____) – 18

110.    Defendants racketeering acts are part of an on-going and continuous pattern, involving defrauding numerous consumers through the same or similar methods.  This pattern of racketeering acts is likely to be repeated and is, on information and belief, Defendants' regular way of conducting business.

111.    As a proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Adkisson has sustained damage in an amount to be proved at trial, and is entitled to recover treble damages, costs of litigation and attorneys' fees.

## SIXTH CAUSE OF ACTION
### *Violations of Racketeer Influenced and Corrupt Organizations Act,* 18 U.S.C. § 1962(d)
### (All Defendants)

112.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

113.    Defendants Monster and Royce are "persons" within the definition of 18 U.S.C.§ 1961(3).  Monster is the founder of Epik Holdings, Epik Inc., and Masterbucks.  Royce has served as the CEO for Epik since September 2, 2022.

114.    Epik is an "enterprise" as defined by 18 U.S.C. § 1961(4) and engaged in, and had activities affecting, interstate and foreign commerce.

115.    Royce and Monster wrongfully conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of Epik through a pattern of racketeering activity.  In connection therewith, Defendants committed, and conspired to commit, the following racketeering acts within the meaning of 18 U.S.C. § 1961(1):

     a.    <u>Fraud by wire, radio or television</u>.  Defendants devised a scheme or artifice to defraud by means of wire communication in interstate or foreign commerce in violation of 18 U.S.C. § 1343, in that, as described above and under false and/or fraudulent pretenses, representations, or promises, purported to act as an escrow service in the sale and purchase of domain names, while in fact, Defendants

COMPLAINT (NO. _____ ) – 19

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

comingled funds entitled for escrow, misappropriated those funds, and used consumers' escrow funds to obfuscate Defendants' fraudulent activities. Defendants used wire transmissions to transmit false or fraudulent representations regarding its escrow services to obtain money that was also transferred by means of wire transmission.

116. On information and belief, Defendants racketeering acts have been on-going for years, and began at least as early as May 11, 2022 and continuing through the present.

117. Defendants racketeering acts are part of an on-going and continuous pattern, involving defrauding numerous consumers through the same or similar methods. This pattern of racketeering acts is likely to be repeated and is, on information and belief, Defendants' regular way of conducting business.

118. As a proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Adkisson has sustained damage in an amount to be proved at trial, and is entitled to recover treble damages, costs of litigation and attorneys' fees.

### SEVENTH CAUSE OF ACTION
### *Unjust Enrichment* (All Defendants)

119. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

120. Defendants have unjustly retained and benefitted from retaining Adkisson's Escrow Funds, at the expense of Adkisson.

121. Under the circumstances, it is unjust for Defendants to retain Adkisson's Escrow Funds.

### EIGHTH CAUSE OF ACTION
### *Conversion* (All Defendants)

122. Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations in the forgoing paragraphs as if fully set forth herein.

COMPLAINT (NO. _____ ) – 20

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

123.    Defendants have willfully interfered with and converted Adkisson's Escrow Funds, as a result of which Adkisson has been deprived of possession and use of its property.

124.    Defendants had no lawful justification to retain Adkisson's Escrow Funds.

125.    As a result of Defendants' actions, Adkisson has been damaged in an amount to be proven at trial but in an amount no less than $307,000.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury as to all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Matthew Adkisson prays for the following relief:

A.    For judgment in favor of Plaintiff, and against Defendants on all claims;

B.    For Plaintiff's actual damages, recovery of unjust enrichment, and treble damages, and punitive damages, in such amounts as may be proven at trial;

C.    For judgment against Defendants for Plaintiff's costs of suit, including Plaintiff's reasonable attorneys' fees;

D.    For pre- and post-judgment interest as allowed by law;

E.    For such other relief as the Court may deem just and proper.

DATED this 31st day of March, 2023.

s/ David A. Perez
David A. Perez, WSBA No. 43959
s/ Christian W. Marcelo
Christian W. Marcelo, WSBA No. 51193
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
E-mail:  DPerez@perkinscoie.com
E-mail:  CMarcelo@perkinscoie.com

Attorneys for Plaintiff Matthew Adkisson

COMPLAINT (NO. _____) – 21