THE HONORABLE MARSHA J. PECHMAN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MATTHEW ADKISSON, an individual,

Plaintiff,

v.

EPIK HOLDINGS, INC., a Washington
Corporation; EPIK INC., a Washington
Corporation; MASTERBUCKS LLC, a
Wyoming company; ROBERT W.
MONSTER, an individual; and BRIAN
ROYCE, an individual,

Defendant.

No. 2:23-cv-00495 MJP

PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER

**NOTE ON MOTION CALENDAR:
MAY 31, 2023**

**ORAL ARGUMENT REQUESTED**

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER (NO. 2:23-CV-495 MJP)
—

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS .............................................................................. 2

    A.    Monster, Royce, and the Epik entities. .............................................. 2

    B.    Defendants defraud Mr. Adkisson and countless other consumers who were simply seeking basic domain registry and escrow services. .......... 4

    C.    Epik Has Defrauded Other Consumers, *and Its Fraud Is Ongoing* ..................... 6

    D.    Epik wants to avoid liability by liquidating its asserts to a third party. ................ 9

III.  ARGUMENT .................................................................................................. 11

    A.    Legal Standard ..................................................................................... 11

    B.    Defendants Admit Liability, and Mr. Adkisson Is Likely to Succeed on his Claims ............................................................................................ 12

        1.    Breach of Contract ................................................................... 12

        2.    Fraudulent Misrepresentation .................................................. 13

        3.    Breach of Fiduciary Duty ......................................................... 14

        4.    Washington Consumer Protection Act ...................................... 15

        5.    Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962(a), (c). ............................................................. 15

        6.    Unjust Enrichment and Conversion .......................................... 18

    C.    Irreparable Harm .................................................................................. 19

    D.    Balance of Equities .............................................................................. 21

    E.    Public Interest ...................................................................................... 22

    F.    No Bond Should be Required ............................................................... 22

    G.    Expedited Discovery ............................................................................ 24

IV.   CONCLUSION ............................................................................................... 24

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– i
162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..................................................................11

*Allstate Ins. Co. v. Tacoma Therapy, Inc.*,
    204 F. Supp. 3d 1181 (W.D. Wash. 2016)................................................15

*Consumer Opinion LLC v. Frankfort News Corp*,
    2016 WL 6804607 (N.D. Cal. Nov. 17, 2016) .........................................22

*Dargan v. Ingram*,
    No. C08-1714RSL, 2009 WL 1437564 (W.D. Wash. May 22, 2009) ...................19

*Fed. Trade Comm'n v. Arlington Press, Inc.*,
    1999 WL 33574020 (C.D. Cal. 1999)........................................................21

*Federal Sav. and Loan Corp. v. Ferm*,
    1989 WL 88415 (9th Cir. 1989) ................................................................23

*In re Focus Media Inc.*,
    387 F.3d 1077 (9th Cir. 2004) ............................................................19, 20

*Johnson v. Coururier*,
    572 F.3d 1067 (9th Cir. 2009) ..................................................................19

*Jorgensen v. Cassiday*,
    320 F.3d 906(9th Cir.2003) ......................................................................23

*JUUL Labs, Inc. v. Chou*,
    CV 21-3056 DSF, 2021 WL 4900374 (C.D. Cal. June 9, 2021)..............23

*Kaspers v. Howmedica Osteonics Corp.*,
    No. C15-0053JLR, 2015 WL 12085853 (W.D. Wash. Oct. 23, 2015)...................12

*Kyko*,
    No. 13-CV-1034, 2013 WL 12173381 (W.D. Wash. June 19, 2013) ..........19, 21, 22

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ....................................................................16

*Markov v. ABC Transfer & Storage Co.*,
    76 Wn.2d 388 (1969) .................................................................................12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

*Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP*,
   110 Wn.App. 412 (2002) .................................................................................14

*Moran v. Bromma*,
   675 F. App'x 641 (9th Cir. 2017) ....................................................................16

*Morley v. Cohen*,
   888 F.2d 1006 (4th Cir. 1989) .........................................................................17

*Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*,
   SACV120463DOCMLGX, 2013 WL 12113414 (C.D. Cal. Feb. 11, 2013)..........................22

*Orr v. Bank of Am.*,
   285 F.3d 764 (9th Cir. 2002) ...........................................................................16

*Panyanouvong v. Aphay*,
   2:14-CV-00275 RSM, 2014 WL 2986507 (W.D. Wash. July 1, 2014) ..........................19, 23

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
   766 F.2d 1319 (9th Cir. 1985.) ........................................................................23

*Priv. Client Fiduciary Corp. v. Chopra*,
   No. 22-CV-00436-LK, 2023 WL 2372917 (W.D. Wash. Mar. 6, 2023) ..................14, 18, 19

*R & R Surgical Inst. v. Int'l Longshore & Warehouse Union*,
   No. CV 21-00640-MWF-AS, 2022 WL 1514653 (C.D. Cal. Jan. 5, 2022) ..........................16

*Stephens v. Marino White O'Farrell & Gonzalez*,
   No. C10-5820BHS, 2011 WL 3516082 (W.D. Wash. Aug. 11, 2011) ................................17

*Styrk v. Cornerstone Invs., Inc.*,
   61 Wn.App. 463 (1991) ...................................................................................14

*Textile Unlimited, Inc. v. A..BMH and Co., Inc.*,
   240 F.3d 781 (9th Cir. 2001) ...........................................................................11

*Tran v. Muhammad*,
   CV 20-01433-CJC(SKX), 2021 WL 681128 (C.D. Cal. Jan. 15, 2021) ..............................23

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
   C14-1178-MJP, 2016 WL 3144378 (W.D. Wash. June 6, 2016) (Pechman, J.)....................11

STATUTES

18 U.S.C.A. § 1961 ...........................................................................................16

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– iii

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

18 U.S.C. § 1961(1) .................................................................................................16

18 U.S.C. § 1961(5) .................................................................................................16

18 U.S.C. § 1962(a) ....................................................................................15, 16, 18

18 U.S.C. § 1962(c) ...........................................................................................15, 18

RCW 18.44.021 ........................................................................................................13

**RULES**

Fed. R. Civ. P. 26(f) .................................................................................................24

Fed. R. Civ. P. 33(b)(2) ............................................................................................24

Fed. R. Civ. P. 34(b)(2)(A) .......................................................................................24

Fed. R. Civ. P. 65(c) .................................................................................................23

**OTHER AUTHORITIES**

*Epik Holdings, Inc. Founder Appoints Successor CEO*, Newswires, Sept. 2, 2022,
    *available at* https://www.einnews.com/pr_news/588955207/epik-holdings-
    inc-founder-appoints-successor-ceo (last visited: May 31, 2023) .............................................2

*The gatekeepers who help open America to oligarchs and scammers*, International
    Consortium of Investigative Journalists, April 5, 2022, *available at*
    https://www.icij.org/investigations/pandora-papers/the-gatekeepers-who-help-
    open-america-to-oligarchs-and-scammers/ (last visited: May 30, 2023) ..................................9

*The Gatekeepers who open America to shell companies and secret owners*, WASH.
    POST, April 5, 2022, *available at*
    https://www.washingtonpost.com/business/interactive/2022/tax-havens-
    wyoming-pandora-papers/ (last visited: May 30, 2023).........................................................9

*Here's why its CEO insists on doing that*, CNN.COM, Dec. 9, 2021, *available at*
    https://www.cnn.com/2021/12/09/business/epik-hack-ceo-rob-monster-
    invs/index.html (last visited: May 30, 2023) .......................................................................2

*Huge hack reveals embarrassing details of who's behind Proud Boys and other
    far-right website*, WASH. POST, Sept. 21, 2021.........................................................2

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– iv

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

National Public Radio, *'Lex Luthor of the Internet': Meet the Man Keeping Far-Right Websites Alive*, Feb. 8, 2021, *available at* https://www.npr.org/2021/02/08/965448572/meet-the-man-behind-epik-the-tech-firm-keeping-far-right-websites-alive (last visited: May 30, 2023) ..................................1

*Parler moves to Epik, a domain registrar known for hosting far-right extremist content*, Business Insider Jan. 12, 2021, *available at* https://www.businessinsider.com/parler-moves-to-epik-domain-known-for-hosting-far-right-2021-1 (last visited: May 30, 2023) .................................................................1

Racketeer Influenced and Corrupt Organization Act (RICO) ............................................... passim

SALON MAGAZINE, Sept. 22, 2021, *available at* https://www.salon.com/2021/09/22/the-fascist-side-of-the-internet-gets-hacked-proud-boys-qanon-websites-fall-victim-to-anonymous/ (last visited: May 30, 2023) ...........................................................................................................................2

Washington Consumer Protection Act.....................................................................................11, 15

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– v

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

## I.    INTRODUCTION

This case is about a widespread and ongoing scheme to defraud consumers and embezzle money between the various corporate and individual defendants. The defendants— Epik Holdings, Epik Inc. and Masterbucks (collectively, "Epik"), Rob Monster (Epik's founder and majority owner), and Brian Royce (Epik's current CEO)—have made clear that they intend to sell Epik's assets to avoid liability and prevent victims like Matt Adkisson, the plaintiff, from being made whole. Mr. Adkisson seeks a temporary restraining order to stop defendants from consummating a deal that even Mr. Monster described as a "badly executed hijack operation" intended to "wipe" Epik clean.  As contemplated, Defendants intend on transferring all of Epik's value to a new shell entity that an "elusive" buyer recently created in Wyoming, leaving Epik with no way to pay a judgment in this case.

Mr. Adkisson easily meets all the requirements for a temporary restraining order.

*First*, he has a *very strong* likelihood of prevailing on the merits. In fact, most of the facts aren't even in dispute: Mr. Adkisson entrusted Epik with over $300,000 to be held in escrow, but Epik never disclosed that it wasn't even licensed to provide escrow services, and had *no intention* on segregating Mr. Adkisson's funds like an escrow service would. Instead, Defendants embezzled the funds, misappropriated the money, and is now holding Mr. Adkisson's assets—and those of countless other consumers—hostage.

*Second*, Mr. Adkisson will suffer irreparable harm if either this current deal, or some other asset sale, goes forward because it will leave Epik unable to make Mr. Adkisson whole. In fact, Epik's own founder and chairman revealed *just yesterday* that the deal has been "has been whittled down to a level insufficient to pay everyone," and that it is a "hijack and fire sale."

Epik claims that there is no irreparable harm because Mr. Adkisson can "veto" the particular asset sale currently being negotiated. This is yet another misrepresentation: Mr. Adkisson obviously has no such veto because despite his strenuous objections and repeated notices

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 23-CV-495 MJP) –
1
162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

that he will seek court intervention, *Epik signed the deal mere hours before this motion was filed*. Besides, absent a court order, there is nothing stopping Defendants from negotiating a new deal tomorrow, or next week, or next month.

*Third*, the balance of equities tilts sharply in Mr. Adkisson's favor because the Court has a strong interest in protecting consumers and victims of financial fraud. The benefits of protecting consumers and victims far outweighs any interest Epik has in pursuing a deal that Epik's own founder calls a "badly executed hijack operation."

*Fourth*, issuing an injunction would serve the public interest because it would stop Epik from liquidating assets in a manner that will leave consumers and victims holding the bag. Even in communications sent mere *hours* before this motion confirms that Epik intends on pursuing a transaction that will benefit *investors*, *insiders*, and *cronies*, but harm *consumers* and *victims* of Epik's fraudulent activity. In fact, Epik's counsel insists that Mr. Adkisson should accept a "take it or leave it" offer of a partial payment—but only in exchange for a release of all claims. Temporarily blocking Epik from hiding assets to avoid liability clearly serves the public interest.

*Fifth*, no bond is required given the likelihood of success on the merits. And although Defendants' offer of a faux-veto was merely designed to convince Mr. Adkisson not to file this motion, it does demonstrate that no bond is required. After all, if Defendants are willing to *stand down* on a deal without demanding a bond, then there is no reason to require a bond simply to issue an injunction that would accomplish the same thing.

The Court should grant the motion to preserve the status quo and prevent irreparable harm.

## II.    STATEMENT OF FACTS

### A.    Monster, Royce, and the Epik entities.

Defendant Robert Monster is the founder and majority owner of the various Epik-related companies, including Defendants Epik Holdings, Epik Inc. and Masterbucks (collectively, "Epik").  Dkt. 15 (Answer to First Amended Complaint ("Amended Answer")) ¶ 7.

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER  (NO. 2:23-CV-495 MJP) – 2

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Epik offers services related to domain name registration, renewal and sales, as well as website hosting. *Id.* ¶¶ 15-17. One of the key services the company offers day-to-day consumers like plaintiff is an escrow service for domain purchases and sales. *Id.* ¶ 54. For instance, when a consumer wants to purchase a website—such as <www.nourish.com>, which is the website at issue in this case—the purchaser can send the money to Epik to hold in escrow, and the seller can transfer the website to Epik to hold in escrow; Epik would then release the funds to the seller, and the website to the buyer. (More on this below.)

Most consumers like plaintiff use Epik for simple and rather quotidian transactions and domain registries. But there is a much darker side to Epik that most consumers are unaware of: the company has made a name for itself by catering to far-right, neo-Nazi, and other extremist services. For instance, after the January 6 insurrection at the Capitol in Washington, D.C., far-right extremist websites like Parler were "de-platformed" by companies like Amazon Web Services. Epik stepped in to host Parler, Gab, and other far-right extremist websites. *See Parler moves to Epik, a domain registrar known for hosting far-right extremist content*, Business Insider Jan. 12, 2021, *available at* [https://www.businessinsider.com/parler-moves-to-epik-domain-known-for-hosting-far-right-2021-1](https://www.businessinsider.com/parler-moves-to-epik-domain-known-for-hosting-far-right-2021-1) (last visited: May 30, 2023); National Public Radio, *'Lex Luthor of the Internet': Meet the Man Keeping Far-Right Websites Alive*, Feb. 8, 2021, *available at* [https://www.npr.org/2021/02/08/965448572/meet-the-man-behind-epik-the-tech-firm-keeping-far-right-websites-alive](https://www.npr.org/2021/02/08/965448572/meet-the-man-behind-epik-the-tech-firm-keeping-far-right-websites-alive) (last visited: May 30, 2023).[1]

Defendant Brian Royce first began working with Monster and Epik in or around March 2022, later becoming the company's Executive Vice President of Operations, placing him in charge of the company's day-to-day operations. Royce was promoted to be Epik's Chief Executive

---

[1] As the Washington Post reported in September 2021, "Epik long has been the favorite Internet company of the far-right, providing domain services to QAnon theorists, Proud Boys and other instigators of the Jan. 6 attack on the U.S. Capitol — allowing them to broadcast hateful messages from behind a veil of anonymity." *Huge hack reveals embarrassing details of who's behind Proud Boys and other far-right website*, WASH. POST, Sept. 21, 2021, *available at* washingtonpost.com/technology/2021/09/21/epik-far-right-hack-anonymous/ (last visited: May 30, 2023)..

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

Officer effective September 1, 2022, and Monster transitioned to a non-executive role as Chairman of the Board. *See Epik Holdings, Inc. Founder Appoints Successor CEO*, Newswires, Sept. 2, 2022, *available at* https://www.einnews.com/pr_news/588955207/epik-holdings-inc-founder-appoints-successor-ceo (last visited: May 31, 2023); *see also* Amended Answer ¶ 7. Upon becoming CEO, Royce took full control of Epik's finances, including funds embezzled from Epik's consumers. Declaration of David Perez ("Perez Decl.") ¶ 3.

**B.   Defendants defraud Mr. Adkisson and countless other consumers who were simply seeking basic domain registry and escrow services.**

Mr. Adkisson is an individual who, in May 2022, needed basic domain registry and escrow services to complete a relatively anodyne purchase: acquiring the domain name <www.nourish.com>.  Declaration of Matthew Adkisson ("Adkisson Decl.") ¶ 2. Mr. Adkisson noticed that the domain name was listed for sale by Epik on Epik.com, and contacted Epik to purchase the domain. *Id.* Monster told Mr. Adkisson he would need to use Epik's escrow services. *Id.* ¶ 3, Ex. A. Monster reassured Mr. Adkisson that Epik's "escrow service [was] #1 in the industry" and would be able to "protect buyer and seller." *Id*. Based on Monster's representations, Mr. Adkisson agreed, wired Epik $327,000 to be held in escrow (the "Escrow Funds"). *Id.* ¶ 4. The way the process was promised to work was simple:  Mr. Adkisson would place the Escrow Funds into an escrow account controlled by Epik.  *Id.* ¶ 5; Perez Decl., Ex. A (screenshot of Epik Escrow). If the seller of the domain name agreed to complete the transaction, he would transfer the domain name to an escrow account to be held by Epik.  *Id.* Then, Epik would release the Escrow Funds to the domain name seller, and the domain name to Mr. Adkisson.  *Id.* If the transaction could not be completed for any reason, the Escrow Funds would be returned to Mr. Adkisson, the consumer.  *Id.* That is how it was *supposed* to work.

Unbeknownst to Mr. Adkisson, however, neither Epik nor Monster were licensed to provide escrow services. Perez Decl. ¶ 3.  Instead of *segregating* Mr. Adkisson's money—which is how escrow funds are to be treated—Defendants **embezzled the money, misappropriating it**

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 4

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**for other purposes that Mr. Adkisson never authorized or even knew about.**   In fact, Defendants *admitted* they failed to keep Mr. Adkisson's funds in escrow as promised. *Id*. This was a coordinated, concerted, and deliberate effort to embezzle funds, and defraud consumers like Mr. Adkisson—who was one of *many* individuals affected by this widespread fraud.

But none of this was known to Mr. Adkisson at the time.

Instead, as fraudsters are wont to do, Defendants hid the truth and strung Mr. Adkisson along for months.  Adkisson Decl. ¶ 7. After nearly six months with no results, on November 14, 2022, Mr. Adkisson requested the return of his Escrow Funds. Adkisson Decl. *Id.* Royce, who became Epik's CEO in September 2022, represented that he would seek to secure the domain name, and expressly promised Mr. Adkisson "if [that] does not work then we of course will return the funds." *Id.*, Ex. C.  Mr. Adkisson relied on this representation and allowed Epik to continue to attempt to secure the domain name.  *Id.* ¶ 9.

After no further progress was made in securing the domain name, on December 2, 2022, Mr. Adkisson explicitly informed Royce and Defendants that he would be ending the domain name purchase transaction and again requested that the Escrow Funds be returned.  *Id.*, ¶ 8, Ex. C. In response, on December 6, 2022, Royce texted Mr. Adkisson and again promised to have Mr. Adkisson's funds "returned [in] short order[.]" *Id.*, Ex. D. Mr. Adkisson again believed and relied on this representation.  *Id.* ¶ 9.  Still, no payment was forthcoming.

Over the next two months, Epik, Royce, and Monster continued to make false promises of repayment.  With growing apprehension, Mr. Adkisson relied on these statements refraining from taking other legal action for several months.  *Id.*

Eventually, in early 2023, Epik admitted that sometime after Adkisson wired the funds to Epik, it was misappropriated, embezzled or both.  Perez Decl. ¶ 4; Amended Answer ¶ 73.  In other words, Epik conceded that the Escrow Funds were no longer available.  *Id.* Epik further claimed that the company was "cash strapped" and that Adkisson's Escrow Funds were misappropriated and used to pay other debts without his authorization.  *Id.*

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 5

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Then, on January 11, 2023, Epik promised to repay Mr. Adkisson his escrow funds. Specifically, the letter stated: "On behalf of Epik Holdings, Inc., Epik shall pay the debt owed to Mr. Adkisson in two installments, one on January 12, 2023, in the amount of $20,000, and the other no later than January 31, 2023, in the amount of $307,000." Perez Decl., Ex. B; Adkisson Decl. ¶ 10, Ex. E. On January 12, 2023, Epik (through Monster) paid Mr. Adkisson $20,000. **No further payments were made.** Adkisson Decl. ¶ 11; Amended Answer ¶ 73.

On January 31, 2023, Monster contacted Mr. Adkisson's counsel. He confirmed that the amount owed to Adkisson—$327,000—was not in dispute. Perez Decl., Ex. D. Further, Monster stated that since Royce became CEO of Epik, Monster "believe[d] the company has had ample opportunity to fund a refund to Mr. Adkisson." *Id.*

In response to Mr. Adkisson's Amended Complaint, Epik admits that "Epik owes Adkisson a refund of the $327,000 in funds he previously transferred to it, and that Epik, though its counsel, acknowledged this during the referenced call [a call with Mr. Adkisson's counsel]." Amended Answer ¶ 73.

## C.    **Epik Has Defrauded Other Consumers,** *and Its Fraud Is Ongoing*

Defendants' scheme has victimized numerous other innocent consumers like Mr. Adkisson.  Many consumers have had similar experiences to Mr. Adkisson, where the consumer either purchased or sold a domain name from Epik using Epik's "escrow" services, but once the payment is sent to Epik, Defendants wrongfully retain, embezzle, and misappropriate some or all of the payment and refuse to pay the consumer what they are owed.  **This is theft.** Here are just a few examples of consumers who have reached out to counsel since this litigation was commenced. There are countless others.

*Manuel Casals*. Mr. Casals sold a domain name for $50,000 using Epik Escrow, which was converted to GBP.  Perez Decl., Ex. E (email from M. Casals' counsel).  Per Epik's escrow process, he transferred the domain name to be held by Epik and the buyer transferred Epik the payment. *Id.*  Mr. Casals was initially able to withdraw 12,000€ from his account. *Id.* However,

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 6

since July 2022—Epik prevented Mr. Casals from withdrawing the remaining 38,000€ from his account. *Id.* Since then, Defendants have offered excuses and promises, but has not been allowed to withdraw his remaining balance. *Id.* In other words, just like Mr. Adkisson, Mr. Casals has simply run into a carousel of revolving excuses intended to delay.

*Neil Bostick*. Mr. Bostick sold two domain names using Epik Escrow in October 2022 for a total of $25,000 in net proceeds to Mr. Bostick. Perez Decl., Ex. F (email from N. Bostick). After transfer of the domains to the buyer and closing of the transaction, Epik never paid out the funds that were being held in escrow. *Id.* As Mr. Bostick describes it, Defendants "are obviously doing criminal fraudulent behavior (while trying to operate a seemingly legitimate business) and I was encouraged to hear that you guys were taking the initiative to bring them to justice." *Id.*

*Kathy Kalaf*. Ms. Kalaf is another consumer that was scammed by Epik.  On September 27, 2022, she used Epik's purported "escrow" services to sell a domain name for $100,000.  Perez Decl., Ex. G.  Epik sold the domain and collected $100,000.  *Id.* Epik, however, wouldn't release the funds to Ms. Kalaf and she has still not received her funds, despite that Brian Royce sent her a letter "acknowledg[ing] the debt of 91,000 USD" owed to Ms. Kalaf.  *Id.* Ms. Kalaf further noted: "[Mr. Royce] sent me numerous texts in December, leading me to believe I may be paid by the end of December. It didn't happen. Over the past 2 weeks, he has led me to believe he will get me paid, and last week asked me if I would settle for $50K, or take a payment plan. I declined on settling. I am not interested in settling for $50K." *Id.* Ms. Kalaf then complained to Mr. Royce: "For nearly 4 months I have been chasing you. For the past 8 weeks, you have been making promises, stalling me, and leading me on and this is taking way too long." *Id.* This is eerily similar to Mr. Adkisson's experience.

### Defendants' fraud is also still in progress.

Several consumers have reported *recently* that they paid Epik for various services, such as renewing or registering domain names, that Epik accepted the payment, *but then did not perform the service paid for*.  For instance, Debra Elliott reports that in March 2023, she paid $314.67 to

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Epik to renew eighteen domain names.  Elliott Decl. ¶ 3.  But the domain names were not renewed, even after she contacted Epik to inform them they had not renewed the domain names.  *Id.*

Similarly, on May 3, 2023, Steve Greenspan paid Epik $199 to renew a domain name; once again Epik *accepted the payment, but did not renew the domain name.*  Greenspan Decl. ¶ 5.  As a result, Mr. Greenspan *lost the domain name* and it is now on the open market.  *Id.* ¶ 5.  Mr. Greenspan also paid Epik $120 on April 14, 2023, to renew eight domain names; again Epik took the money but didn't renew the domain names. *Id.* ¶ 6.  And most recently, on May 26, 2023, Mr. Greenspan paid Epik $15.99 to renew a domain name and had the same result: Epik took the money, but did not renew the domain name. *Id.*

On May 1, 2023, Derek Peterson purchased a domain name from Epik for $10.  Once again, Epik accepted the payment but did not register the domain name. Peterson Decl. ¶¶ 2-5. Now the domain that Mr. Peterson paid for, *and which Epik accepted payment for*, belongs to a third party using a different registrar. *Id.* ¶ 5.

These are only a few of the consumers that have reached out after Mr. Adkisson filed his complaint. Online complaints regarding Epik are replete with similar stories of fraud. Perez Decl., Exs. H-I.  For instance:

- On February 5, 2023, a consumer reported that they sold a domain name for $20,000 using Epik's escrow services, but after taking the domain name, Epik kept the payment and did not release it to the consumer. *Id*.

- On April 7, 2023, a consumer posted a complaint that they lost $1.5 million in September 2021—again after Royce took over—detailing numerous instances of fraud. The consumer specifically noted that Royce personally promised "to cover in full their debt" and "asked us to wait patiently" but still no payment was forthcoming. *Id*.

- On March 9, 2023, a consumer reported that since October 2022, he has been unable to withdraw his $10,800 balance from Epik. *Id*.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

⚜ And just three days ago, on May 28, 2023, a consumer reported he paid to transfer a domain name, but "Epik collected [his] funds and lost [his] domain." *Id*.

There is no shortage of victims who Defendants defrauded in this widespread and concerted effort to defraud consumers. *See* Perez Decl., Exs. H-I.

**D.     Epik wants to avoid liability by liquidating its asserts to a third party.**

On April 11, 2023, shortly after filing his complaint, Mr. Adkisson's counsel e-mailed Defendants raising concerns that the Epik entities were trying to sell off their assets "in an apparent effort to avoid repayment" to victims like Mr. Adkisson. Perez Decl., Ex. J.  Mr. Adkisson's counsel made clear he would seek "immediate injunctive relief" if the company pursued an asset sale. *Id*. Mr. Royce responded right away with the assurance that "[n]o asset sales are pending at this time." *Id*. Once again, that representation was false; unbeknownst to Mr. Adkisson, Defendants were pursuing an asset sale all along.

On May 13, after learning that the company was pursuing the very asset sale that Mr. Royce had assured was not "pending," counsel for Mr. Adkisson again reached out to Epik and Mr. Monster. *Id*., Ex. K. In that message, counsel made clear that "this so-called asset sale will serve only to transfer the valuable assets of the company to a third party, leaving it unable to re-pay consumers like Mr. Adkisson, causing irreparable harm." *Id*. Counsel reiterated Mr. Adkisson's intention to seek a temporary restraining order. In response, Epik's counsel acknowledged the potential transaction, and offered a partial payment only if Mr. Adkisson "release[d] all claims." *Id*.

Last week, Defendants disclosed that the potential buyer of Epik's assets is Registered Agents, Inc., a company whose role in offering registered agent services to scammers and shell companies was recently revealed by several investigative journalists.  *See The gatekeepers who help open America to oligarchs and scammers*, International Consortium of Investigative Journalists, April 5, 2022, *available at* https://www.icij.org/investigations/pandora-papers/the-gatekeepers-who-help-open-america-to-oligarchs-and-scammers/ (last visited: May 30, 2023);

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 9

162258575.2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

*The Gatekeepers who open America to shell companies and secret owners*, WASH. POST, April 5, 2022, *available at* https://www.washingtonpost.com/business/interactive/2022/tax-havens-wyoming-pandora-papers/ (last visited: May 30, 2023).

Just yesterday, Mr. Monster himself revealed that the proposed transaction is part of a larger scheme to raid Epik of its valuable assets, and line the pockets of Mr. Royce's friends and contacts. Specifically, in an e-mail to Perkins Coie, Mr. Monster disclosed that Mr. Royce and Epik's current leadership have "destroyed" the company, and that in December 2022 Mr. Royce "gifted a bunch of Epik assets" to unnamed individuals with whom Mr. Royce is affiliated. *Id.*, Ex. L. In other words, even as the company Mr. Royce is now running has been withholding Mr. Adkisson's money (and that of countless other consumers), Mr. Royce and Epik have been quietly raiding the cabinets to ensure nothing is left of value. Notably, in this same message—sent ***only yesterday***—Mr. Monster discloses that there have been numerous other potential buyers of Epik's assets—meaning the current proposed buyer is hardly the only one.

Mr. Monster also sent the proposed asset purchase agreement, and even confirmed that Registered Agents recently created a new company, aptly named Epik, LLC. This new Epik is the "buyer."  In other words, Defendants intend on transferring assets from one Epik entity to another—all to avoid liability. Mr. Monster himself believes that Epik and Registered Agents (the real contemplated buyer) are "being elusive" about what corporate entities will be involved. *Id.*, Ex. L.

In another message to counsel—also sent just yesterday—Mr. Monster reveals that the asset sale "*has been whittled down to a level insufficient to pay everyone*," and that "there has been an egregious pattern of side deals and self-dealing during the last 10 months, and that the objective is to wipe it [Epik] all clean." *Id.*, Ex. M.  Mr. Monster calls the transaction a "hijack and fire sale," which will "injure[] many people," and "a badly executed hijack operation." *Id.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

In response to Mr. Monster's disclosures, Mr. Adkisson's counsel immediately reached out *again* to Epik's counsel, urging Epik to hold off on the fraudulent sale, and that Mr. Adkisson intended to seek emergency relief. Perez Decl., Ex. N.

Epik dismissed the need for an injunction by assuring Mr. Adkisson he could "veto" the transaction, and because Mr. Adkisson would get *some money* out of the deal.

Neither objection holds water. Mr. Adkisson has no "veto"—as shown by the fact that Defendants are pushing forward with the transaction *despite Mr. Adkisson's objections*. But more to the point, Mr. Adkisson isn't a party to the asset sale, so he can't enforce this faux-veto. Likewise, the potential for a partial payment to Mr. Adkisson is not enough to make him whole. Moreover, Epik is offering a partial payment only if Mr. Adkisson releases his claims against defendants—a precondition he is not obligated to accept, and will not accept.

Incredibly, despite Mr. Adkisson's repeated warnings to not proceed, Defendants executed the Asset Purchase Agreement with Registered Agents *today* with no prior notice to Mr. Adkisson and ignoring the fact that he already "vetoed" the deal. Perez Decl., Ex. O. Notably, the executed Asset Purchase Agreement makes clear that "Buyer DOES NOT AND WILL NOT assume, and expressly disclaims any assumption of indebtedness, liabilities, or obligations of any kind" from its purchase. *Id.* ¶ 3.a. (emphasis in original). In other words, the defrauded consumers are meant to be left without any way to recover their stolen funds.

The Court should intervene to stop this self-dealing "badly executed hijack operation," preserve the status quo, and ensure that consumers like Mr. Adkisson are made whole.

## III.    ARGUMENT

### A.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, C14-1178-MJP, 2016 WL 3144378 (W.D. Wash.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 11

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

June 6, 2016) (Pechman, J.). The standard "is substantially identical for the injunction and the TRO." *Id.* (quoting *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). The Ninth Circuit uses a "sliding scale" approach to these factors where "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). When the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only "serious questions going to the merits." *Id.* at 1135. "The purpose of injunctive relief is to preserve the status quo and prevent the irreparable loss of rights." *Textile Unlimited, Inc. v. A..BMH and Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).

**B.      Defendants Admit Liability, and Mr. Adkisson Is Likely to Succeed on his Claims**

Mr. Adkisson asserts claims for breach of contract, fraud, breach of fiduciary duty, violation of Washington's Consumer Protection Act, violations of the Racketeer Influenced and Corrupt Organization Act (RICO), unjust enrichment, and conversion.  There is no dispute as to the facts that makeup the heart of each of these claims.

Mr. Adkisson only needs to show a likelihood of success *on one claim*—but with those facts established without dispute, it is clear Mr. Adkisson is likely to succeed on all his claims.

**1.      Breach of Contract**

The contract claim is simplest and most straightforward: Monster and Epik promised that in exchange for Mr. Adkisson using Epik's escrow services, Epik would hold Mr. Adkisson's funds in escrow.  That's a binding agreement.  Likewise, each of Monster, Royce and Epik made promises to Mr. Adkisson to return his Escrow Funds.  Adkisson Decl. ¶¶ 3-10.  Clearly, however, Epik did not hold Mr. Adkisson's funds in escrow, and as a result Mr. Adkisson has been damaged and unable to recover his Escrow Funds.  That's a clear breach with resulting damages.  In fact, Defendants have essentially conceded liability for the claim.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

## 2.     Fraudulent Misrepresentation

"[I]f a promise is made for the purpose of deceiving and with no intention to perform, it constitutes such fraud as will support an action for deceit." *Markov v. ABC Transfer & Storage Co.*, 76 Wn.2d 388, 396 (1969). Likewise, "if the promise is made without care or concern whether it will be kept, and the promisor knows or under the circumstances should know that the promisee will be induced to act or refrain from acting to his detriment, the promise will likewise support an action by the promise." *Id.*

To induce Mr. Adkisson to send his money to Epik, and then to delay Mr. Adkisson from recovering that money so that it could be misappropriated by Epik, Defendants have spun a web of fraudulent misrepresentations.

First, Monster promised Mr. Adkisson that Epik would keep his money in escrow. Adkisson Decl. ¶ 3.  That was not true.  But Mr. Adkisson relied on these representations and wired $327,000 to Epik. Defendants now concede Mr. Adkisson's funds were never held in escrow.  Perez Decl. ¶¶ 3-4.  And when Monster made his representations to Mr. Adkisson that his funds would be kept in escrow, he knew those representations were false.  Indeed, Monster and Epik weren't even licensed to perform escrow services, and engaging in such a practice was unlawful. Perez Decl. ¶ 3; RCW 18.44.021 ("It shall be unlawful for any person to engage in business as an escrow agent by performing escrows or any of the functions of an escrow agent … unless such person possesses a valid license issued by the director pursuant to this chapter.").

Then, once Defendants had successfully induced Mr. Adkisson to send his money to Epik, they began their scheme to delay his recovery of funds.  As Epik's CEO, Mr. Royce continually promising to return the funds, knowing that Epik had no intention of doing so.  Adkisson Decl. ¶¶ 7-8.  These delay tactics continued for months, with false promise after false promise.  In reality, while Royce and Epik were promising the return of Adkisson's funds, *Epik was stealing money from other consumers*.  *See* Perez Decl. Ex. E (Manuel Casals) Ex. F (Neil Bostick); Ex. G (Kathy Kalaf).  Defendants made these false representations knowing they did not intend to pay

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 13

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Mr. Adkisson back—apparently, they did not even have the ability to do so when they made the promises.  Perez Decl. ¶ 4 (Epik claiming it was "cash strapped" and could not pay Mr. Adkisson). As a result of these false promises to repay Mr. Adkisson and his reliance on those promises, Defendants successfully bought themselves additional time to misappropriate Mr. Adkisson's and other consumer's funds, and to find a willing partner to fraudulently transfer and secret away Epik's remaining assets.

### 3.    Breach of Fiduciary Duty

"An escrow agent owes a fiduciary duty to the parties to the escrow to conduct the transaction with scrupulous honesty, skill and diligence, and must comply strictly with the provisions of the escrow agreement."  *Styrk v. Cornerstone Invs., Inc.*, 61 Wn.App. 463, 472, (1991) (attorney acting as escrow agent had fiduciary duty to individual entrusting funds to escrow agent).  Defendants thus had a fiduciary duty to Mr. Adkisson when Monster represented that Epik would act as an escrow agent for Mr. Adkisson, asking Mr. Adkisson to entrust Monster and Epik with his money and after accepting the Escrow Funds to be held in escrow.  Likewise, while Mr. Adkisson's Escrow Funds were still in the care of Epik, Royce took control of Epik's finances and business operations as Epik's CEO, and reiterated the promise to return Mr. Adkisson's funds to him if the domain name purchase did not go through.  So, Royce, too, had had a fiduciary duty to Mr. Adkisson.

There was also a clear breach of that duty.  Defendants did not maintain Mr. Adkisson's Escrow Funds in escrow and certainly did not act with "scrupulous honesty, skill and diligence" when they misappropriated his funds and made false promises to repay him.  Likewise, Defendants breached their fiduciary duties by failing to comply with the escrow instructions after Mr. Adkisson instructed Defendants to "wire the funds back" and "return the funds held in escrow."  Adkisson Decl., Ex. C.  Mr. Adkisson is thus likely to succeed on his fiduciary duty claim.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 14

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

### 4.      Washington Consumer Protection Act

The elements to establish a violation of Washington's Consumer Protection Act, are (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) injury to his business or property; and (5) that the injury was proximately caused by the unfair or deceptive act. *Allstate Ins. Co. v. Tacoma Therapy, Inc.*, 204 F. Supp. 3d 1181, 1187–88 (W.D. Wash. 2016). It is hard to imagine a more straightforward CPA claim than this.

Defendants—including Epik Inc. and Epik Holdings Inc. which are both Washington corporations—have engaged in a series of unfair and deceptive actions as a core part of their business practice.  Such actions include unlawfully claiming to offer escrow services when they were not licensed to do so and where they, in fact, did *not* perform proper escrow services (e.g., by commingling and misappropriating "escrow" funds).  Instead, Defendants only *claimed* to provide escrow services so they could steal consumer's funds.  *See* Perez Decl., Exs. E-I.

Worse, Defendants' unfair and deceptive conduct is *ongoing* as Epik continues to take money from consumers while not actually providing any of the services they promise.  *See* Greenspan Decl.; Peterson Decl.; Elliott Decl.

This conduct is both unfair and deceptive, occurring in commerce, and clearly impacts the public interest as demonstrated by the numerous other victims. Mr. Adkisson is likely to succeed on this claim as well. Under the CPA, Mr. Adkisson is entitled to damages and attorneys' fees.

### 5.      Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962(a), (c).

Relevant here, Mr. Adkisson asserts two RICO claims against Defendants for violations of 18 U.S.C. § 1962(a) and (c).

The elements of a RICO claim under 18 U.S.C. § 1962(c) are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

Violations of 18 U.S.C. § 1962(a) are similar and that section of the statute makes it unlawful for "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

As to the first and second elements, the conduct at issue is being performed by an enterprise. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961. Epik, which Monster (its owner) and Royce (its CEO) are both working in furtherance of, constitutes an enterprise. *Moran v. Bromma*, 675 F. App'x 641, 645 (9th Cir. 2017) (unpublished) ("a corporate officer is sufficiently distinct from the corporation for which he works such that a plaintiff can allege the officer as the RICO person and the corporation as the RICO enterprise")

As for the third and fourth elements, Defendants have engaged in a pattern of racketeering activities by committing wire fraud in order to effectuate their fraudulent scheme.  Racketeering activities include wire fraud, and "'pattern of racketeering activity' requires at least two acts of racketeering activity[.]"  18 U.S.C. § 1961(1), (5).  "To state a RICO claim based on the predicate act of mail and wire fraud, a plaintiff must plead, in addition to the other elements of a RICO claim, '(1) a scheme or artifice devised with (2) the specific intent to defraud and (3) use of the United States mail or interstate telephone wires in furtherance thereof.'" *R & R Surgical Inst. v. Int'l Longshore & Warehouse Union*, No. CV 21-00640-MWF-AS, 2022 WL 1514653, at *6 (C.D. Cal. Jan. 5, 2022) (quoting *Orr v. Bank of Am.*, 285 F.3d 764, 782 (9th Cir. 2002)).

Here, it is evident that Defendants have committed several counts of wire fraud.  First, Defendants fraudulently induced Mr. Adkisson to wire $327,000 to Epik, claiming it would be held in escrow.  Defendants knew, however, that Mr. Adkisson's funds would not be held in

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 16

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

escrow, and that Defendants were not even licensed to provide escrow services.  Instead, these actions were taken in furtherance of Defendants' scheme to induce Mr. Adkisson to wire the Escrow Funds to Epik, to defraud Mr. Adkisson, so Defendants could misappropriate the Escrow Funds.  The communications with Mr. Adkisson, and the services provided by Epik for Mr. Adkisson to wire the Escrow Funds to Epik through Epik.com used wires as a means of transmission.  That, too, constitutes wire fraud.  *Stephens v. Marino White O'Farrell & Gonzalez*, No. C10-5820BHS, 2011 WL 3516082, at *3 (W.D. Wash. Aug. 11, 2011) (emails, phone calls, and wire transfers sufficient to establish wire fraud to support RICO claim).

Defendants then engaged in a series of delay tactics, using text messages and emails directed to Mr. Adkisson, aimed at assuring him that his Escrow Funds were safe and would be returned.  Adkisson Decl. ¶¶ 7-10.  The goal of those communications was part of Defendants' scheme to delay Mr. Adkisson from seeking to recover his funds, reporting Epik's unlawful behavior, and alerting the numerous other consumers Defendants were in the process of scamming. Similar delay tactics have formed the basis for other successful RICO claims, and constitute wire fraud in furtherance of Defendants' fraudulent scheme:  "It is settled that the statutes encompass use of the mails or wires after the initial financial transaction when such use is 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *See Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (affirming jury decision where a jury could reasonably conclude that defendant's communications were used to "lull [plaintiff] into leaving investments in [defendant]'s control, and that they were therefore part of [defendant]'s 'ongoing scheme to defraud'") (cleaned up).

Defendants' pattern of racketeering activity is further demonstrated by the numerous consumers that Defendants defrauded in similar ways to Mr. Adkisson and the numerous consumers they *continue* to defraud.  *See* Perez Decl., Exs. E-I; Greenspan Decl.; Peterson Decl.;

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

162258575.2

Elliott Decl.  These other defrauded consumers confirm both the existence of Defendants' fraudulent scheme, but also that it is still in place to this day.

Thus, Mr. Adkisson is likely to succeed in establishing Defendants' violations of 18 U.S.C. § 1962(c).

Likewise, Mr. Adkisson is likely to succeed in establishing Defendants' violations of 18 U.S.C. § 1962(a).  There is no doubt that Monster and Royce—Epik's owner and CEO—received "income derived, directly or indirectly, from a pattern of racketeering activity" and used it in connection with the operation of the Epik enterprise.  After all, Epik received the Escrow Funds, failed to sequester those funds as promised, comingled the Escrow Funds with other consumers' funds Defendants misappropriated, and used the funds in connection with Epik, including to pay other debts.

Finally, there can be no doubt that Mr. Adkisson was damaged given the money Defendants misappropriated. On these facts, he will be entitled to treble damages and attorneys' fees. 18 U.S.C. 1963 (any person injured by violation of Section 1962 "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.").

### 6.    Unjust Enrichment and Conversion

Mr. Adkisson has shown a strong likelihood of prevailing on his claims for conversion and unjust enrichment. Defendants admit that Epik received the Escrow Funds, that Epik owes Mr. Adkisson the balance of at least $307,000 from the Escrow Funds, and that Mr. Adkisson has not been paid.  Amended Answer ¶ 73.  Epik also admitted that the Escrow Funds were used for other purposes by Epik, other than those authorized by Mr. Adkisson.  Perez Decl. ¶¶ 3-4.  Thus, Defendants have willfully and unlawfully retained Mr. Adkisson's escrow funds, and deprived him of the funds.  That's conversion.  Defendants also knowingly received the benefit of the Escrow Funds under circumstances that would be clearly inequitable to allow them to retain the Escrow Funds.  That's unjust enrichment.  Mr. Adkisson is thus likely to succeed on both claims.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 18

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

**C.   Irreparable Harm**

Mr. Adkisson will be immediately and irreparably harmed if the asset fire sale moves forward. "Where Plaintiffs seek an asset freeze, they must also show 'the likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.'" *Kyko*, No. 13-CV-1034, 2013 WL 12173381, at *4 (W.D. Wash. June 19, 2013) (Pechman, J.) (quoting *Johnson v. Coururier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *Panyanouvong v. Aphay*, 2:14-CV-00275 RSM, 2014 WL 2986507 (W.D. Wash. July 1, 2014) (finding irreparable harm where defendants misappropriated plaintiff's investment for defendants' personal gain). Courts find a likelihood of dissipation of assets if there is evidence of a defendant fraudulently concealing assets. *See Dargan v. Ingram*, No. C08-1714RSL, 2009 WL 1437564, at *3 (W.D. Wash. May 22, 2009) (large cash gifts from defendant's brother to his wife, and defendant's lies regarding his income); *In re Focus Media Inc.*, 387 F.3d 1077, 1086 (9th Cir. 2004).

If Epik is allowed to proceed with its asset sale of "substantially all the assets" owned by Epik, as it intends to do shortly, Mr. Adkisson, and the numerous other consumers from whom Epik stole money will never be made whole. In fact, Mr. Monster himself disclosed **yesterday** that the deal has been "*whittled down to a level insufficient to pay everyone*," and part of "an egregious pattern of side deals and self-dealing during the last 10-months" with the objective to "wipe [Epik] clean." Perez Decl. Ex. M. And several months ago, Mr. Royce—the current CEO driving the deal—"gifted a bunch of Epik assets" to unnamed individuals with whom he is affiliated. *Id*., Ex. L That Mr. Monster himself—Epik's founder, majority owner, and a defendant in this very litigation—would candidly call the deal "a badly executed hijack operation," and that the company is "*being elusive*" about the true buyers. *Id*. Ex. M.

Nevertheless, Epik wants to strong arm Mr. Adkisson into standing down, going so far as to *execute* the deal in an attempt to force Mr. Adkisson to accept a partial payment and release his claims. **That is absurd.** Mr. Adkisson should not be forced to accept *less* than he is owed and less than what will make him whole—including his lost interest, attorneys' fees, and trebled damages

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

from his RICO claims—simply to allow Epik to transfer its assets and avoid liability. The strategy here is obvious: dangle a partial payment to Mr. Adkisson (but not make him whole), while stranding all other consumer high and dry. All the while, Epik's leadership and the potential buyer can line their pockets with money and assets *stolen from consumers.* That's unacceptable.

Defendants also have a history of misappropriating and concealing funds, and there is no reason to believe that will not occur here. Mr. Adkisson is but one of countless consumers that Epik misappropriated funds from. And that fraud is *continuing* to this day. Mr. Adkisson is thus likely to suffer irreparable harm if the asset sale proceeds because Defendants are likely to, once again, misappropriate the funds from the sale as they have done and are still doing with consumer funds. *See In re Focus Media Inc.*, 387 F.3d at 1086 (finding "the specter of irreparable harm" in part because of "evidence in the record that in the past [the defendant] made away with [the bankrupt company's] funds").

Epik will argue that it has offered Mr. Adkisson $307,000 from the proceeds of the transaction (but only in exchange for a release). But that *confirms* that the transaction will cause irreparable harm because that partial payment ensures Mr. Adkisson will forfeit his attorneys' fees—fees he never would have needed to incur but for Defendants' fraud.

Epik may also argue (as it did in an e-mail to counsel) that there is no irreparable harm because Mr. Adkisson has a faux "veto" over the transaction. This is a red herring. If Mr. Adkisson's strenuous objections to the deal fell on deaf ears, of course he has no veto. Besides, there is nothing stopping Epik from simply negotiating a different deal with the same buyer or another buyer altogether.

But more to the point: now that Epik has made clear that it intends to give Mr. Adkisson a veto (which Mr. Adkisson is clearly exercising), then Epik should have no problem with the Court issuing this injunction to make that veto binding.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 20

162258575.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**D.    Balance of Equities**

To determine whether the balance of hardships favors the moving party, courts must "balance the interests of all parties and weigh the damage to each." *Kyko*, 2013 WL 12173381, at *4 ("Prohibiting Defendants from transferring or dissipating funds without Court approval—at least until they can be heard on the matter in the next ten days—is not a burdensome condition given that Defendants were not wholly engaged in a legitimate, lawful business. Thus, the risk weighs more heavily in favor of Plaintiffs"); *Fed. Trade Comm'n v. Arlington Press, Inc.*, 1999 WL 33574020, *13 (C.D. Cal. 1999) ("[T]he benefit in protecting consumers against potentially fraudulent activity, and securing for those who may have already been injured some form of redress outweighs the harm that may be suffered by individuals associated with the business.").

Here, the balance of equities tips sharply in Mr. Adkisson's favor.  There is no dispute that Epik owes him the funds at issue.  If the asset sale continues, Mr. Adkisson faces a significant risk that there will be *no funds or assets for him*, or for other consumers, to collect from Epik.  Defendants have a history of comingling funds, making misrepresentations, and not following through on commitments.  By misappropriating funds and assets in the past, *including Mr. Adkisson's*, Defendants have repeatedly shown that they are not engaged in any lawful or legitimate business.

Defendants, meanwhile, have little legitimate interest in going forward with an asset sale that the company's own founder (and majority owner) describes as "a badly executed hijack operation." Perez Decl., Ex. M.  Nor is there any pressing need to do so *now*, much less to "elusive" entities outside the Court's jurisdiction.  This is a classic (and obvious) attempt to extract the company's value, and leave consumers like Adkisson holding the bag. By preserving the status quo, the Court can ensure that any asset sale is accomplished in a manner that makes consumers whole—not investors, cronies, or insiders.

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 21

162258575.2

**E.      Public Interest**

Issuing a temporary restraining order clearly serves the public interest.  "It is in the public interest to prevent defendants in civil cases from avoiding liability or payment of money judgments by secreting assets." *Consumer Opinion LLC v. Frankfort News Corp*, 2016 WL 6804607, at *5 (N.D. Cal. Nov. 17, 2016) (enjoining transferring of domain names to other registrars and/or deleting material from those websites); *Kyko*, 2013 WL 12173381, at *4 (finding that "preserving the status quo and preventing Defendants from transferring or dissipating funds will advance the public interest").  Without the temporary restraining order, Mr. Adkisson and other Epik customers face a significant risk that Defendants will dissipate Epik's assets as part of this transaction or any future transaction preventing customers from recovering their misappropriated funds.  *Neighborhood Assistance Corp. of Am. v. First One Lending Corp.*, SACV120463DOCMLGX, 2013 WL 12113414 (C.D. Cal. Feb. 11, 2013) ("freezing assets to preserve the possibility of an equitable remedy would clearly serve the public interest, as … disgorged profits will be used to make restitution to those people harmed by Defendants' unlawful actions.").

Absent a temporary injunction, Epik will continue misappropriating and comingling funds as it has been doing for years.  It is also in the public interest to preserve the status quo and to protect Epik's assets from distribution for Adkisson and for other consumers who have fallen victim to Defendants' ongoing schemes.  *Federal Sav. and Loan Corp. v. Ferm*, 1989 WL 88415, *5 (9th Cir. 1989) (finding evidence of fraud sufficient to show public interest in preventing further injury).  Allowing Defendants to continue with this transaction, misappropriating funds, or dissipating assets serves no public interest.

**F.      No Bond Should be Required**

The Court should not require a bond. Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 22

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

wrongfully enjoined or restrained." "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919(9th Cir.2003) (internal quotations omitted).

A strong likelihood of success on the merits also "tips in favor of a minimal bond or no bond at all." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985.); *Tran v. Muhammad*, CV 20-01433-CJC(SKX), 2021 WL 681128 (C.D. Cal. Jan. 15, 2021) (finding no bond required in granting preliminary injunction to freeze assets given plaintiff "presented a strong likelihood of success on the merits"); *see also JUUL Labs, Inc. v. Chou*, CV 21-3056 DSF (PDX), 2021 WL 4900374 (C.D. Cal. June 9, 2021) (setting $25,000 bond to freeze over $1 million in Defendants' assets). Given Adkisson's strong likelihood of success on the merits, including Defendants' admission that he is entitled to the relief he seeks, there is little risk that Defendants will be "wrongfully enjoined." This alone should jettison the need for a bond.

Moreover, "the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*; *Panyanouvong*, 2014 WL 2986507 (W.D. Wash. July 1, 2014) (finding "the risk that Defendants would suffer damages in the unlikely event of wrongful injunctive relief is minimal, as the injunction merely preserves Defendants' assets during the pendency of this litigation[.]"). Defendants' representation that Mr. Adkisson has a "veto" over potential asset sale, a veto that Mr. Adkisson has undoubtedly exercised and will exercise if Defendants' representations are genuine, confirms that entering a TRO will not harm Defendants. In any event, Defendants readily acknowledge that there are alternative potential buyers and that the current potential buyer has been interested in Epik's assets for quite some time. There is no legitimate evidence that this asset sale must happen immediately, or even in the near future. Given the relief Adkisson seeks is merely to preserve Epik's assets, there is no realistic likelihood of harm to Defendants.

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER  (NO. 2:23-CV-495 MJP) – 23

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

On the contrary, issuing the injunction *would help the company*. After all, Epik's own founder and majority owner (Mr. Monster) has disclosed that the company's current leadership—Mr. Royce and his cronies—are raiding the company's assets, including by "gift[ing] a bunch of Epik assets" to insiders and unnamed affiliates. Perez Decl., Ex. L. An injunction to stop these fraudulent asset transfers would prevent all that, and ensure that the company is in a position *to pay consumers*—not investors, cronies, or insiders.

**G.     Expedited Discovery**

Mr. Adkisson seeks a limited order ensuring he will have the discovery necessary to in advance of a preliminary injunction hearing.

The Court should order Defendants to fully respond to Mr. Adkisson's outstanding discovery requests, **including producing all responsive documents**, by the 30-day deadline imposed by Federal Rule of Civil Procedure 33(b)(2) and 34(b)(2)(A), with all documents produced (with a privilege log) by June 26.  Timely responses are critical to Mr. Adkisson's presentation of evidence at the preliminary injunction hearing.

Second, Mr. Adkisson seeks limited and targeted depositions of Defendants Monster and Royce, and corporate depositions of Epik Holdings, Inc., Epik, Inc., Masterbucks LLC, to support Mr. Adkisson's preliminary injunction.  Mr. Adkisson seeks up to four-hour depositions of each to discuss the issues giving rise to the TRO motion and the need for a preliminary injunction. These depositions are critical for Mr. Adkisson and the Court to determine what assets need to be frozen during the pendency of these proceedings.  Given the limited scope of these depositions and their timing before more discovery is complete, such depositions should be taken without prejudice for Adkisson to take full-day depositions of each witness later in the case.

### IV.     CONCLUSION

The Court should grant the motion.

I certify that this memorandum contains 8,376 words, in compliance with the Local Civil Rules.

RESPECTFULLY SUBMITTED this 31st day of May, 2023

s/ David A. Perez
David A. Perez, WSBA No. 43959
Christian W. Marcelo, WSBA No. 51193
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: DPerez@perkinscoie.com
E-mail: CMarcelo@perkinscoie.com

Attorneys for Plaintiff Matthew Adkisson

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER  (NO. 2:23-CV-495 MJP)
– 25

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that on May 31, 2023, I electronically filed the

foregoing PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following attorney(s) of record:

| | |
|---|---|
| Andrew Ramiro Escobar<br>SEYFARTH SHAW LLP (SEA)<br>999 THIRD AVE STE 4700<br>SEATTLE, WA 98104<br>206-946-4910<br>aescobar@seyfarth.com | Meryl Hulteng<br>SEYFARTH SHAW LLP (SEA)<br>999 THIRD AVE STE 4700<br>SEATTLE, WA 98104<br>206-946-4910<br>mhulteng@seyfarth.com |

I further certify that I caused service to be made on the following non-CM/ECF

participants by the method(s) indicated:

| | |
|---|---|
| Robert Monster<br>*Pro Se*<br><rob@monsterventurepartners.com> | ___  Via hand delivery<br>___  Via U.S. Mail, 1st Class, Postage Prepaid<br>___  Via Overnight Delivery<br>___  Via Facsimile<br> X   Via Email<br>___  Other: _____ |

DATED this 31st day of May, 2023.

 *s/ David A. Perez*_____
David A. Perez

CERTIFICATE OF SERVICE
(NO. 23-CV-495 MJP) – 1

162258575.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000